**STATE of Minnesota, Respondent,**

v.

**Gerald Arthur GILLESPIE, Appellant.**

No. A05–269.

Court of Appeals of Minnesota.

Feb. 28, 2006.

Mike Hatch, Attorney General, John Garry, Assistant Attorney General, St. Paul, MN; and Jeffrey R. Edblad, Isanti County Attorney, Cambridge, MN, for respondent.

Paul W. Rogosheske, Thuet, Pugh, Rogosheske & Atkins, Ltd., South St. Paul, MN, for appellant.

Considered and decided by LANSING, Presiding Judge; SHUMAKER, Judge; and HALBROOKS, Judge.

## OPINION

LANSING, Judge.

A jury found Gerald Gillespie guilty of terroristic threats, false imprisonment, and fifth-degree domestic assault following a trial in which Gillespie represented himself. The conviction was based on testimonial and medical evidence that Gillespie assaulted his wife. On appeal from the denial of his motion for a new trial, Gillespie challenges the jury-selection process, the admission of the victim's medical records and the testimony of her treating physician, and the district court's failure to advise him that he could stipulate to his prior convictions. Because we conclude that the district court did not err by admitting the medical records and the physicians testimony and did not plainly err on the remaining issues, we affirm.

## FACTS

### *Jury Selection*

At the beginning of the trial, the district court indicated that it intended to call twenty prospective jurors for voir dire. This number represented eight more jurors than the court would need to impanel to serve on the twelve-person jury. The court told Gillespie he would receive five peremptory challenges and told the state it would receive three. The court then explained that Gillespie and the prosecutor would have the opportunity to question the jurors after the court completed its voir dire. When the court told Gillespie that he would have an opportunity to exercise his peremptory strikes after questioning was completed, Gillespie responded, "I'm not going to do any strikes." The court explained to Gillespie that he was required to strike five jurors.

When the panel was drawn, only seventeen prospective jurors were available for voir dire. To be able to proceed, the court eliminated the state's peremptory challenges. The court indicated that if it struck any prospective jurors for cause, it would ask Gillespie if he would be willing to give up some of his peremptory challenges. If Gillespie was not willing, the court would declare a mistrial and start over the next day. Gillespie did not object.

Before voir dire, the court went through the questions it would be asking the panel and asked Gillespie if there were any questions he would like the court to ask. Gillespie replied, "No comment." During voir dire, four jurors each said that they had previously served on a criminal jury. The court asked those jurors how long ago they had served and whether they had reached verdicts.

In response to later questioning, two of the four jurors with past jury experience stated that they would find it difficult to be an impartial juror. The first said that she had experienced domestic violence within her family and initially indicated that she "would probably be pretty partial." But after further questioning she confirmed that she was willing to be objective. Gillespie ultimately struck this juror peremptorily. The second of the two prospective jurors with past jury experience expressed disillusionment over the tactics one of the attorneys had used in the previous case. But she nonetheless confirmed that she could listen to the facts objectively, and she was impaneled without objection. The remaining two jurors with past jury experience were also impaneled without objection.

After concluding its voir dire, the court told Gillespie that it was his opportunity "to ask any questions [he wanted] of the jurors." Gillespie replied, "I have no questions." The court then asked Gillespie if he passed the jury for cause. Gillespie

responded, "Yes, oh, yes." Gillespie then exercised his peremptory challenges.

### Medical Evidence

Several months before trial, the state applied for the release of the victim's medical records. The state provided the victim with a copy of the application, advised her how to contest it, and stated that the court would likely release her records if she did not object. The victim did not respond. A week later, the court granted the application.

After receiving the records, the state filed a motion in limine, seeking to introduce the victim's medical records, the testimony of her treating physician, and evidence of Gillespie's prior domestic-assault convictions. When the district court asked Gillespie if he opposed the motion to admit the victim's medical records and her physician's testimony, Gillespie replied, "No comment." When asked whether he opposed the motion to admit evidence of his prior convictions, Gillespie similarly replied, "No comment." The court granted the motion to admit the records and the physician's testimony and took the prior-convictions issue under advisement. Before the second day of testimony began, Gillespie moved to exclude the physician's testimony. The court denied the motion, reasoning that the issue previously had been decided.

The medical records reflected that a physician at a regional medical center examined the victim the day after she was assaulted and that her sister was present during the examination. At trial, the physician testified that the victim's abdominal and neck muscles were tender and that he found bruises on the victim's middle finger, right leg, and left wrist. The physician also testified that the victim told him that Gillespie had punched her stomach and head, pushed her onto a bed, put a pillow over her head, and sat on her. The victim also told the physician that Gillespie had abused her physically and emotionally for seven years. The victim later conveyed the same information to a deputy sheriff. The information that the victim gave to law enforcement became the basis of the complaint against Gillespie.

This appeal follows the denial of Gillespie's motion for a new trial.

### ISSUES

I. Given its decision not to impanel any alternate jurors, did the district court plainly err by calling only seventeen prospective jurors for voir dire?

II. Did the district court plainly err by not asking prospective jurors who had previously served on criminal juries follow-up questions about their service?

III. Did the district court plainly err by not sua sponte striking the jurors who initially indicated partiality?

IV. Did the district court err by admitting the victim's medical records and her physician's testimony over Gillespie's assertion of the physician-patient privilege?

V. Did the district court have a duty to advise Gillespie that he could stipulate to his prior convictions?

### ANALYSIS

Failure to object to an alleged error in the district court generally constitutes waiver of the right to raise the issue on appeal. *State v. Litzau*, 650 N.W.2d 177, 182 (Minn.2002). Despite having the opportunity to challenge the jury-selection procedure, Gillespie did not object to any part of the process. Nor did he object to the admissibility of his prior convictions. By failing to object, Gillespie waived consideration of these issues on appeal. *See*

*State v. Quick*, 659 N.W.2d 701, 718 (Minn. 2003) (stating that defendant who fails to object to jury-selection process forfeits right to object on appeal).

■ Nonetheless, the court may, in its discretion, consider plain errors affecting substantial rights. Minn. R.Crim. P. 31.02; *State v. Griller*, 583 N.W.2d 736, 740 (Minn.1998). Plain errors are reversible only if they seriously affected the fairness, integrity, or public perception of the proceedings. *Griller*, 583 N.W.2d at 742.

## I

Gillespie first argues that the district court violated Minn. R.Crim. P. 26.02, subd. 4, by calling only seventeen venire-members for voir dire. Gillespie's argument lacks a solid base because it is premised on the erroneous assumption that the court was required to impanel alternate jurors.

Rule 26.02 prescribes three methods for selecting a jury. Under the first method, the district court must direct that as many prospective jurors be drawn and called as will equal the number of jurors who must be sworn plus the number of peremptory challenges available to both parties and the number of any alternate jurors. Minn. R.Crim. P. 26.02, subd. 4(3)(a)1. Under the second method, the court must direct that as many prospective jurors be drawn and called as will equal the number of jurors who must be sworn plus the number of any alternate jurors. *Id.*, subd. 4(3)(b). The third method is not relevant to this case.

■ The district court made it clear before and during voir dire that it intended to seat no alternate jurors. The court stated at the outset that the jury would be a twelve-person jury. The court then told the parties that it intended to call twenty prospective jurors for voir dire and noted that it was calling eight more people than would be seated. The court ultimately seated only twelve jurors. The decision not to impanel any alternate jurors was within the court's discretion. *See id.*, subd. 8 (providing that "trial judge may impanel alternate or additional jurors whenever in the judge's discretion, the judge believes it advisable to have such jurors available to replace jurors who, prior to the time the jury retires to consider its verdict, become unable or disqualified to perform their duties"). Because the trial lasted only one day, the court did not abuse its discretion by opting not to impanel any alternate jurors.

■ Given the court's decision not to impanel alternate jurors, its decision to proceed to voir dire with only seventeen prospective jurors was not error. Under the first jury-selection method, the court was required to draw and call a minimum of seventeen prospective jurors (the twelve jurors required for a criminal trial plus the number of peremptory challenges available to both parties, which the court reduced to five, presumably to comply with the rule 26.02, subdivision 4(3)(a)1). Under the second method, the court was required to draw and call a minimum of twelve prospective jurors (the twelve jurors required for a criminal trial). The court did not err, therefore, by proceeding to voir dire with only seventeen veniremembers.

## II

Gillespie next argues that the court committed plain error by failing to ask follow-up questions of prospective jurors who indicated that they had previously served on criminal juries. We disagree. Although it would have been preferable for the court to question these jurors further, the court's limited voir dire did not constitute

plain error under the circumstances of this case.

■■ The purpose of voir dire is to probe the jury for bias or partiality to enable counsel to exercise informed peremptory challenges and challenges for cause. Minn. R.Crim. P. 26.02, subd. 4(1). The Constitution "does not dictate a catechism for *voir dire,* but only that the defendant be afforded an impartial jury." *Morgan v. Illinois,* 504 U.S. 719, 729, 112 S.Ct. 2222, 2230, 119 L.Ed.2d 492 (1992). Nonetheless, the defendant's right to an impartial jury is guaranteed, in part, by an adequate voir dire that permits the identification of unqualified jurors. *Id.* The scope of voir dire is committed to the district court's sound discretion. *Mu'Min v. Virginia,* 500 U.S. 415, 422, 111 S.Ct. 1899, 1904, 114 L.Ed.2d 493 (1991) (stating that court retains great latitude in deciding what questions should be asked on voir dire); *Rosales–Lopez v. United States,* 451 U.S. 182, 189, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981) (recognizing that trial judge's first-instance obligation to impanel impartial jury must be accompanied with ample discretion to rely and act on immediate perceptions). The district court abuses its discretion if its failure to ask sufficient questions renders the defendant's trial fundamentally unfair. *Mu'Min,* 500 U.S. at 425, 111 S.Ct. at 1905 (stating that questions are not constitutionally compelled simply because they "might be helpful").

■ The rules of criminal procedure require the district court to ask prospective jurors any questions it deems necessary to ascertain their qualifications to serve as jurors in the case on trial. Minn. R.Crim. P. 26.02, subd. 4(1). The parties may supplement the court's voir dire by questioning prospective jurors themselves. *Id.* Despite its broad discretion in determining the scope of voir dire, the court may not unreasonably limit counsel's right to elicit sufficient information to determine if a peremptory challenge is advisable. *State v. Evans,* 352 N.W.2d 824, 827 (Minn.App. 1984).

■ In this case, the district court asked prospective jurors if they had previously served on a criminal jury. The information was significant because a party may challenge for cause a prospective juror who previously served on a jury that tried another person for the same or a related offense. Minn. R.Crim. P. 26.02, subd. 5(1)9. The court then asked if the jurors who had previously served on a criminal jury had reached a verdict in the other case. But neither the court nor the parties asked follow-up questions to test the jurors for bias that might have resulted from their past jury service.

Ideally, the district court should have inquired about the nature of the charges in the previous cases and the effect of the jurors' past jury service on their present ability to serve. *See Darbin v. Nourse,* 664 F.2d 1109, 1113 (9th Cir.1981) (stating that probing inquiry is necessary because general inquiries often fail to reveal relationships or experiences that may cause unconscious or unacknowledged bias). Because the district court's questioning was sufficient to elicit the information necessary for the parties to test the prospective jurors for bias or partiality, the court's limited voir dire did not constitute error.

■■ Even if the court's limited voir dire had constituted error, the error would not warrant a new trial for four reasons. First, Gillespie failed to object to the court's limited voir dire. A criminal defendant may not stand silently by during voir dire, acquiesce in the proceedings, and accept the jury panel as constituted, only later to assail the process on appeal. *See State v. Stofflet,* 281 N.W.2d 494, 497

(Minn.1979) (recognizing that allowing defendant to withhold objections and obtain new trial or acquittal based on resulting error would foster abuse of fair-trial procedures).

Second, Gillespie did not ask the court to conduct additional inquiry into the prospective jurors' past service, even though the court extended the opportunity to both attorneys to submit additional questions. Presumably, Gillespie was satisfied that the district court's inquiry was sufficient. *See People v. Vieira*, 35 Cal.4th 264, 25 Cal.Rptr.3d 337, 106 P.3d 990, 1004 (2005) (holding that defendant could not challenge district court's refusal to include particular question in jury questionnaire because defendant did not request such question).

Third, Gillespie had the opportunity to inquire further into the jurors' past service during his voir dire of the prospective jurors. *See id.* (holding that refusal to include particular question in jury questionnaire was not error so long as parties themselves had opportunity to ask question during voir dire). He may not now complain that the questioning was insufficient to test for bias.

Finally, Gillespie has not established that the court's limited questioning made the trial fundamentally unfair. *See Quick*, 659 N.W.2d at 718 (finding no plain error when defendant failed to establish prejudice). No evidence indicates that the veniremembers who were not questioned extensively about their past jury service held specific biases that made Gillespie's trial fundamentally unfair. Without more, past jury service does not establish bias.

Given the strength of the evidence against Gillespie, the lack of an objection, Gillespie's failure to ask for a more thorough inquiry or to question the prospective jurors himself, and the absence of a showing of prejudice, reversal based on the court's limited voir dire is unwarranted.

### III

Gillespie next argues that the district court committed plain error by failing to strike sua sponte the two veniremembers who had previously served on a jury and who initially expressed reservations about their ability to be impartial. We disagree.

■ Challenges for cause must be initiated by motion. Minn. R.Crim. P. 26.02, subd. 5(1) (stating that "juror may be challenged for cause *by either party* " (emphasis added)). A challenge for cause "may be oral and shall state the grounds on which it is based." *Id.*, subd. 5(2). The court's role is to determine whether to sustain the challenge. *See id.* (defining district court's duty on challenge for cause). Neither the caselaw nor the rules of criminal procedure impose on the district court a duty to strike prospective jurors for cause sua sponte. *See State v. Yant*, 376 N.W.2d 487, 491 (Minn.App. 1985).

We have previously held that the district court did not have a duty to replace sleeping jurors sua sponte when the court believed that the defendant was not prejudiced and the defendant was apprised of the potential misconduct and declined to voir dire the jurors, replace them with alternates, or move for a mistrial. *Id.* at 491. In this case, as in *Yant*, the district court could reasonably have inferred from the defendant's failure to object that, as a tactical matter, Gillespie was willing to retain the prospective jurors. Indeed, because the second of these two jurors had indicated that she was disappointed in lawyers, Gillespie may reasonably have concluded that it was to his advantage to retain her as a juror, and it may have been error for the district court to dismiss this juror for cause sua sponte.

■ Even if we concluded that the court had a duty to dismiss prospective jurors for cause sua sponte, the exercise of this duty is still subject to the district court's discretion. *See id.* (applying abuse-of-discretion standard to sua sponte replacement of jurors). Both of the jurors initially indicated reservations about their ability to serve as an impartial juror. When the district court asked further questions, however, they indicated that they could be objective or impartial jurors. Because of this rehabilitation, the district court· did not abuse its discretion by not dismissing them for cause sua sponte.

■ The test of an impartial juror is that he "can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *State v. Andrews,* 282 Minn. 386, 394, 165 N.W.2d 528, 534 (1969) (quotation omitted); *see also State v. Alladin,* 408 N.W.2d 642, 650 (Minn.App.1987) ("A juror must simply undertake to try the case fairly, and the trial judge, being in the best position to observe and assess the demeanor of the prospective juror, is to be given deference in determining whether the juror should be removed for cause."). Gillespie's claim of reversible error with respect to the first of these prospective jurors fails at the outset because he struck the juror peremptorily, and she was not impaneled. *See Ross v. Oklahoma,* 487 U.S. 81, 86, 108 S.Ct. 2273, 2277, 101 L.Ed.2d 80 (1988) (stating any claim that jury was not impartial must focus on jurors who ultimately sat). Even if Gillespie had not struck this juror, the court did not abuse its discretion by failing to strike her for cause sua sponte because she indicated her willingness to consider the evidence objectively. Similarly, the court did not abuse its discretion by not striking the second juror for cause, because the second juror ultimately concluded that she could listen to the facts objec-

tively. Gillespie's claim that the district court had a duty to dismiss these two veniremembers for cause sua sponte is unpersuasive.

## IV

Gillespie also argues that the district court violated the victim's physician-patient privilege by admitting the victim's medical records and by allowing her physician to testify about statements the victim made in the course of treatment. We conclude otherwise.

■ The physician-patient privilege prevents medical providers from disclosing information acquired in the context of a physician-patient relationship. Minn.Stat. § 595.02, subd. 1(d) (2004). The purpose of the privilege is to encourage patients' full disclosure of information, which will enable medical providers to extend the best medical care possible. *See State v. Staat,* 291 Minn. 394, 397, 192 N.W.2d 192, 195 (1971) (stating that "theory underlying [the physician-patient] privilege is that a patient's fear of an unwarranted, embarrassing, and detrimental disclosure in court of information given to his doctor would deter the patient from freely disclosing his symptoms to the detriment of his health" (quotation omitted)). The privilege is "solely for the protection of the patient and is designed to promote health and not truth." *Snyker v. Snyker,* 245 Minn. 405, 407, 72 N.W.2d 357, 359 (1955). Because the privilege belongs to the patient, no person other than the patient has standing to invoke the privilege. *See State v. Rice,* 411 N.W.2d 260, 262 (Minn.App. 1987) (holding that, because privilege against self-incrimination is personal to witness, defendant lacked standing to contest grant of immunity to witness who testified against him).

Reasoning that the physician-patient privilege belongs to the patient, courts in

other jurisdictions have held that a criminal defendant lacks standing to assert the victim's physician-patient privilege as a shield against prosecution. *See, e.g., People v. Palomo*, 31 P.3d 879, 885 (Colo.2001) (stating that defendant may not assert privilege "to raise issues concerning the medical records in [the victim's] file"); *State v. Evans*, 802 S.W.2d 507, 511 (Mo. 1991) (holding that defendant convicted of raping his girlfriend lacked standing to object to introduction of her medical records on basis of physician-patient privilege); *In re Grand Jury Proceedings*, 56 N.Y.2d 348, 452 N.Y.S.2d 361, 437 N.E.2d 1118, 1120 (1982) (stating that criminal defendant "should not be permitted to assert the victim's physician-patient privilege as a bar to production of relevant medical records or testimony"); *State v. Boehme*, 71 Wash.2d 621, 430 P.2d 527, 536–37 (1967) (stating that physician-patient privilege is designed to protect patient and "should not, by unrealistic or impractical application, become a means whereby criminal activities of third persons may be shielded from detection, prosecution, and punishment, however magnanimous, compassionate or conciliatory the victim might otherwise wish to be").

We, too, conclude that the physician-patient privilege is personal and may not be invoked by a criminal defendant to shield himself from prosecution. Allowing a criminal defendant to exclude relevant medical evidence by asserting the privilege of a victim who has not expressed any concerns about confidentiality would convert the privilege into a tool for shielding criminal activity from prosecution and would result in a miscarriage of justice. By contrast, the purpose underlying the physician-patient privilege would be minimally frustrated, if at all, by not allowing a defendant to invoke the victim's privilege.

Even if Gillespie had standing to invoke the victim's privilege, the privilege was unavailable because the victim waived it by allowing her sister to be present during the examination and by voluntarily disclosing to a deputy sheriff the information she gave the physician in the course of treatment. The presence of a third party during consultation or treatment renders statements a patient makes to a physician nonprivileged if the third party is not a necessary and customary participant in the consultation or treatment. *State v. Kunz*, 457 N.W.2d 265, 267 (Minn.App.1990) (holding that privilege did not apply to observations acquired by physician during medical examination because police officer was in room with patient's acquiescence during examination), *review denied* (Minn. Aug. 23, 1990); *see also State v. Andring*, 342 N.W.2d 128, 133 (Minn.1984) (holding that statements made in group-psychotherapy sessions were privileged). The victim's sister was not a necessary and customary participant in the consultation, and she was present during the consultation with the victim's consent. Her presence during the consultation, therefore, rendered the victim's statements to the physician nonprivileged. Additionally, the statements lost their privileged character after the victim disclosed them to a deputy sheriff, and they became the basis of the criminal complaint against Gillespie. *See State v. Clark*, 296 N.W.2d 372, 376 (Minn.1980) (stating that information, once made public, loses its privileged character). The filing of the complaint rendered the information public and removed the protection that the physician-patient privilege might otherwise have afforded.

Gillespie argues that the state's motion in limine lacked "factual or evidentiary support" because it was unaccompanied by affidavits, testimony, or medical records. But Gillespie has cited no authority for the

proposition that a motion must be supported by anything other than persuasive legal arguments and authority. The state offered persuasive arguments and legal authority for each of its requests. Nothing more was required.

## V

Last, Gillespie argues that the district court erred by not advising him that he had a right to stipulate to prior convictions, which the state used to prove motive and intent.

 Pro se litigants are generally held to the same standard as attorneys. *State v. Seifert,* 423 N.W.2d 368, 372 (Minn.1988), *superseded by rule on other grounds,* Minn. R.Crim. P. 28.02, subd. 5, *as recognized in Black v. State,* 560 N.W.2d 83, 86 (Minn.1997). Just as the court is not required to advise attorneys about trial strategy, the court is not required to advise pro se defendants about trial strategy. Furthermore, in light of the state's position that the convictions were admissible on the issue of motive and intent, any tactical suggestion from the court would have drawn the court into the trial itself and compromised its judicial function.

## DECISION

The district court did not plainly err by proceeding to voir dire with seventeen veniremembers, by failing to ask follow-up questions of prospective jurors who indicated that they had previously served on criminal juries, by not sua sponte dismissing prospective jurors who initially indicated partiality, or by failing to advise Gillespie that he had a right to stipulate to his prior convictions. Nor did the district court err by admitting into evidence the victim's medical records and her physician's testimony.

**Affirmed.**