*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1520**

State of Minnesota,
Respondent,

vs.

Angela Tharnaa Hooks,
Appellant.

**Filed August 22, 2016
Affirmed
Johnson, Judge**

Ramsey County District Court
File No. 62-CR-14-4188

Lori Swanson, Attorney General, St. Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Peter R. Marker, Assistant County Attorney, St. Paul, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Roy G. Spurbeck, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Stauber, Presiding Judge; Ross, Judge; and Johnson, Judge.

**U N P U B L I S H E D   O P I N I O N**

**JOHNSON**, Judge

A Ramsey County jury found Angela Tharnaa Hooks guilty of one count of identity theft involving eight or more victims. The state's evidence shows that Hooks used stolen

credit cards and debit cards to purchase gift cards at Target stores. On appeal, Hooks argues that the district court erred by instructing the jury, in response to a question, that "you must deliberate until you can come to a unanimous verdict." She also argues that the evidence is insufficient to support the jury's verdict. We conclude that the district court's answer to the jury's question is erroneous but is not reversible error under the plain-error test. We also conclude that the evidence is sufficient to support the verdict. Therefore, we affirm.

**FACTS**

In June 2014, the state charged Hooks with one count of identity theft involving eight or more victims, in violation of Minn. Stat. § 609.527, subds. 2, 3(5), 7 (2012). The case was tried to a jury in May 2015. The state called 20 witnesses: 17 women whose purses were stolen from vehicles that were parked in public places, a Target employee with responsibility for investigating theft and fraud, a Ramsey County deputy sheriff, and a City of Roseville police detective. Hooks did not present any evidence.

The case was submitted to the jury in the morning of the fourth day of trial. After approximately two hours, the jury foreperson sent a note to the district court, asking, "What happens if all 12 jurors cannot come to a unanimous decision?" The district court called the jury into the courtroom and orally answered the question as follows: "All I can say to the jury is that you must deliberate until you can come to a unanimous verdict. So you can go back with the deputies. Thank you." Neither party objected to the district court's answer to the jury's question.

2

Approximately three hours later, the jury returned a verdict of guilty. The district court sentenced Hooks to 117 months of imprisonment and ordered her to make restitution to the victims in amounts of $1,000 or more per person.  Hooks appeals.

## D E C I S I O N

### I.  Supplemental Jury Instruction

Hooks first argues that the district court erred by instructing jurors that they "must deliberate until [they] can come to a unanimous verdict."

The district court record indicates that Hooks did not object to the district court's answer to the jury's question.  Accordingly, this court reviews for plain error.  *See* Minn. R. Crim. P. 31.02.  Under the plain-error test, an appellant is entitled to relief on an issue to which no objection was made at trial only if (1) there is an error, (2) the error is plain, and (3) the error affects the appellant's substantial rights.  *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998).  If these three requirements are satisfied, the appellant also must satisfy a fourth requirement, that the error "seriously affects the fairness and integrity of the judicial proceedings."  *State v. Little*, 851 N.W.2d 878, 884 (Minn. 2014).

### A.

The first step in the analysis is to determine whether the district court erred.  *See Griller*, 583 N.W.2d at 740.

In general, a district court must instruct a jury in a way that "fairly and adequately explain[s] the law of the case" and does not "materially misstate[] the applicable law." *State v. Koppi*, 798 N.W.2d 358, 362 (Minn. 2011).  With respect to a jury's duties in deliberations, the supreme court has summarized the applicable law as follows:

> If a trial court believes a jury is unable to agree, it "may require the jury to continue their deliberations and may give or repeat an instruction . . . . The court shall not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals." *State v. Kelley*, 517 N.W.2d 905, 909 (Minn. 1994) (quoting A.B.A. Standards for Criminal Justice § 15–4.4(b) (1986)). "[I]t is reversible error in Minnesota to coerce a jury towards a unanimous verdict. A court, therefore, can neither inform a jury that a case must be decided, nor allow the jury to believe that a 'deadlock' is not an available option." *State v. Jones*, 556 N.W.2d 903, 912 (Minn. 1996) (citations omitted).

*State v. Buggs*, 581 N.W.2d 329, 337-38 (Minn. 1998) (alterations in original).

In this case, the district court's statement to jurors that they "must deliberate until [they] can come to a unanimous verdict" is a misstatement of the applicable law. The plain language of the district court's supplemental instruction would, if followed, coerce a deadlocked jury to return a unanimous verdict by causing jurors "to believe that a 'deadlock' is not an available option." *See id.* at 338 (quotation omitted). The erroneous nature of the district court's supplemental instruction is illustrated by two supreme court opinions. In *State v. Martin*, 297 Minn. 359, 211 N.W.2d 765 (1973), the supreme court concluded that the district court erred by suggesting to a deadlocked jury that it was required to reach "a unanimous result" and that any juror with a minority view should acquiesce to the majority view. *Id.* at 362-63, 372-73, 211 N.W.2d at 767, 772-73. Similarly, in *Kelley*, the supreme court concluded that the district court erred by giving a supplemental instruction that told deadlocked jurors to "keep deliberating" because the supplemental instruction "may have led them to conclude that they were *required* to deliberate until a unanimous verdict was reached." 517 N.W.2d at 909. Furthermore, a

rule of criminal procedure states, "The jury may be discharged without a verdict if the court finds there is no reasonable probability of agreement." Minn. R. Crim. P. 26.03, subd. 20(4). In light of these authorities, the district court's supplemental instruction is erroneous because it is an incorrect statement of law.

**B.**

The second step in the analysis is to determine whether the district court's error is plain. *See Griller*, 583 N.W.2d at 740. An error is plain if it is clear or obvious, and an error is clear or obvious if it "contravenes a rule, case law, or a standard of conduct, or when it disregards well-established and longstanding legal principles." *State v. Brown*, 792 N.W.2d 815, 823 (Minn. 2011).

The district court's supplemental jury instruction is clearly and obviously inconsistent with the law that applies if a jury is deadlocked. But it is neither clear nor obvious that the same principles apply if a jury is not deadlocked. In *State v. Cox*, 820 N.W.2d 540 (Minn. 2012), the jury foreperson submitted a note to the district court that stated: "We have agreed on a verdict on two charges, but have not been able to agree on a third charge. What happens if we are unable to agree on the third charge?" *Id.* at 550. The second sentence of the jury's question in *Cox* is nearly identical to the jury's question in this case. The supreme court resolved the issue in *Cox* in part by stating:

> The jury's note does not indicate that the jury was deadlocked. By asking, "What happens *if* we are unable to agree on the third charge" (emphasis added), the jury appears to seek guidance not because the jury is currently deadlocked, but in the event that the jury may become deadlocked in the future. Thus, we conclude that the court did not abuse its discretion in

5

> instructing the jury to continue deliberating because the jury
> was never deadlocked.

*Id.* at 551. In the next paragraph, the supreme court continued by analyzing the substance of the district court's answer to the jury's question, which was consistent with the applicable caselaw. *See id.* at 551-52. It appears that the supreme court relied on the absence of a deadlock as an adequate and independent basis for concluding that the district court did not commit error and then relied on the propriety of the supplemental instruction as an alternative basis for affirmance. *See id.* at 550-52. Given that understanding of *Cox*, the district court's error in this case is not plain because the jury's note does not indicate that it was deadlocked.

## C.

The third step in the plain-error analysis is to determine whether the district court's error, if plain, affected the defendant's substantial rights. *See Griller*, 583 N.W.2d at 740. An error affects a defendant's substantial rights "if the error was prejudicial and affected the outcome of the case." *Id.* at 741. "In the context of jury instructions, we have held that an error affects substantial rights when there is a reasonable likelihood that a more accurate instruction would have changed the outcome in this case." *State v. Gutierrez*, 667 N.W.2d 426, 434-35 (Minn. 2003) (quotation omitted). An appellant bears a "heavy burden" in seeking to satisfy the third requirement. *State v. Davis*, 820 N.W.2d 525, 535 (Minn. 2012) (quotation omitted).

In her brief, Hooks suggests that the district court's erroneous supplemental jury instruction affected her substantial rights because it coerced the jury's verdict. But Hooks

6

has not identified any particular features of the district court record that would tend to indicate that coercion actually occurred. At oral argument, the state suggested that the court should analyze the third requirement of the plain-error test by considering (1) the district court's earlier instruction about jury deliberations, (2) the fact that the jury was not deadlocked, (3) the relatively short time periods in which the jury deliberated, and (4) the state's overwhelming evidence of guilt. In his rebuttal argument, Hooks's appellate counsel did not dispute the propriety of these criteria.

The four considerations described above lead to the conclusion that the district court's erroneous supplemental jury instruction did not affect the outcome of the trial. First, the district court gave the jury a proper instruction on the same subject before the jury began its deliberations. The district court instructed jurors to "deliberate with a view toward reaching agreement" but without "violating . . . individual judgment" or "surrender[ing] [an] honest opinion . . . merely to reach a verdict." *See* 10 Minnesota Dist. Judges' Ass'n, *Minnesota Practice—Jury Instruction Guides*, § 3.04, at 42-43 (6th ed. 2015). The jury likely was not coerced by the erroneous supplemental instruction because it earlier received an accurate instruction. *See Buggs*, 581 N.W.2d at 338 (reasoning that earlier instruction based on CRIMJIG 3.04 reduced prejudicial effect of subsequent potentially coercive instruction); *cf. Jones*, 556 N.W.2d at 907-08, 911 (reasoning that supplemental instruction based on CRIMJIG 3.04 ameliorated effect of earlier erroneous instruction). Second, as stated above, the jury's note does not indicate that it actually was deadlocked. Third, the jury deliberated for only two hours before submitting its question to the district court, and for only three additional hours after receiving the supplemental

7

instruction, before returning a verdict at approximately 3:00 p.m. These considerations lead us to believe that the district court's erroneous instruction likely did not affect the outcome of the case and that a more accurate instruction likely would not have changed the outcome.

Fourth, the state's evidence of guilt was voluminous and detailed. The state called 20 witnesses: 3 investigators and 17 victims (even though the charge required only 8 victims). The state introduced exhibits consisting of 76 pages of documentation of the unauthorized transactions. The state also introduced surveillance videos showing a woman resembling Hooks inside Target stores and a vehicle resembling Hooks's vehicle in the parking lots outside Target stores at the dates and times of some of the unauthorized transactions. The state also introduced evidence that police officers found clothing and accessories in Hooks's home and vehicle that matched the clothing and accessories worn by the woman shown in the surveillance videos. The state's evidence, though circumstantial in nature, was very strong, and Hooks did not introduce any evidence to contradict or explain the state's evidence. This consideration also leads us to believe that the district court's erroneous instruction likely did not affect the outcome of the case and that a better instruction likely would not have changed the outcome. Thus, Hooks has not shown that the district court's erroneous supplemental instruction affected her substantial rights.

Because Hooks has not satisfied either the second requirement or the third requirement of the plain-error test, she is not entitled to a new trial based on the district court's erroneous supplemental jury instruction.

8

## II. Sufficiency of the Evidence

Hooks also argues that the evidence is insufficient to support the jury's verdict. She does not challenge the quantum of the state's evidence. Rather, she contends that, even if the state proved that she used stolen credit cards and debit cards to purchase Target gift cards, she did not commit the charged offense of identity theft because credit cards and debit cards do not contain or reflect an "identity."

Hooks's argument raises an issue of statutory interpretation. We begin the task of interpreting a statute by asking "whether the statute's language, on its face, is ambiguous." *American Tower, L.P. v. City of Grant*, 636 N.W.2d 309, 312 (Minn. 2001). A statute is ambiguous "if it is reasonably susceptible to more than one interpretation." *Lietz v. Northern States Power Co.*, 718 N.W.2d 865, 870 (Minn. 2006) (quotation omitted). If a statute is ambiguous, we apply "the canons of statutory construction to determine its meaning." *County of Dakota v. Cameron*, 839 N.W.2d 700, 705 (Minn. 2013). If a statute is unambiguous, we "interpret the words and phrases in the statute according to their plain and ordinary meanings." *Graves v. Wayman*, 859 N.W.2d 791, 798 (Minn. 2015). We apply a *de novo* standard of review when determining whether a defendant's conduct is within a statutory definition. *State v. Hayes*, 826 N.W.2d 799, 803 (Minn. 2013).

The statute that sets forth the offense of which Hooks was convicted provides as follows: "A person who transfers, possesses, or uses an identity that is not the person's own, with the intent to commit, aid, or abet any unlawful activity[,] is guilty of identity theft . . . ." Minn. Stat. § 609.527, subd. 2. The term "identity" is defined to mean

any name, number, or data transmission that may be used, alone or in conjunction with any other information, to identify a specific individual or entity, including any of the following:

(1)    a name, Social Security number, date of birth, official government-issued driver's license or identification number, government passport number, or employer or taxpayer identification number;

(2)    unique electronic identification number, address, account number, or routing code; or

(3)    telecommunication identification information or access device.

*Id.*, subd. 1(d) (2012).

Hooks contends that she did not transfer, possess, or use an "identity" because the definition of that term does not encompass credit cards or debit cards. She notes that section 609.527 defines the term "payment card" to mean "a credit card, charge card, debit card, or any other card that . . . (1) is issued to an authorized card user; and (2) allows the user to obtain, purchase, or receive credit, money, a good, a service, or anything of value." *Id.*, subd. 1(j). She also notes that the definition of "identity" does not include any reference to a "payment card." In light of these definitions, Hooks asserts that "[i]f the Legislature had wanted the information contained on a payment card . . . to meet the definition of an identity, it simply would have referenced the words 'payment card' within" the definition of "identity." Hooks further contends that the legislature's intent to exclude payment cards from the definition of "identity" is indicated by the fact that using another person's credit card or debit card without permission already constitutes a crime, the crime of financial transaction fraud. *See* Minn. Stat. § 609.821, subd. 2(1) (2012).

Hooks's argument fails because credit cards and debit cards are within the definition of "identity" even though the definition of "identity" does not include the term "payment card." To reiterate, the main clause of the definition of "identity" refers to "any name, number, or data transmission that may be used . . . to identify a specific individual or entity." Minn. Stat. § 609.527, subd. 1(d). Credit cards and debit cards customarily bear both a person's name and a unique account number. Together, the name and number identify a particular person. It is immaterial that the definition of "identity" does not expressly refer to a "payment card" because the definition refers to other terms that describe credit cards and debit cards. The examples of names, numbers, and data in subparagraphs (1), (2), and (3) of the definition of "identity" are not exclusive because they are introduced by the phrase "including any of the following." *Id.* Such a phrase "should be read as inclusive, not exclusive" because it is "a term of enlargement, not restriction." *Peterson v. City of Minneapolis*, 878 N.W.2d 521, 525 (Minn. App. 2016).

In the circumstances of this case, the definition statute is unambiguous because it is not "reasonably susceptible to more than one interpretation." *See Lietz*, 718 N.W.2d at 870 (quotation omitted). In light of the plain language of the statute, any person who "transfers, possesses, or uses" a credit card or debit card "that is not the person's own, with the intent to commit, aid, or abet any unlawful activity[,] is guilty of identity theft," even though the term "payment card" is not included in the definition of "identity." *See* Minn. Stat. § 609.527, subds. 1(d), 2.

Because the state introduced evidence capable of proving that Hooks used stolen credit cards and debit cards to engage in unlawful activity, the state's evidence is sufficient

11

to support the jury's verdict that Hooks is guilty of identity theft involving eight or more victims.

**Affirmed.**